## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**PEOPLE FOR PEARCE and STEVE E. PEARCE,**
**U.S. Representative for New Mexico's Second**
**Congressional District,**

        **Plaintiffs,**

**v.**                               **No. 17-cv-752 JCH/SMV**

**MAGGIE T. OLIVER, in her individual capacity**
**and her official capacity as Secretary of State of**
**the State of New Mexico; HECTOR H.**
**BALDERAS, JR., in his individual capacity and**
**his official capacity as Attorney General of the**
**State of New Mexico; and DIANNA LUCE, in her**
**official capacity as Fifth Judicial District Attorney**
**of New Mexico,**

        **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 31, 2017, Plaintiffs People for Pearce and Steve E. Pearce ("Plaintiffs") filed

a Motion for Preliminary Injunction and Memorandum Brief in Support (ECF No. 16). Plaintiffs

seek a preliminary injunction against enforcement of certain provisions of the New Mexico

Campaign Reporting Act (the "CRA"), codified at N.M. Stat. § 1-19-25 to -36, the restrictions of

which are described in an advisory opinion letter dated July 19, 2017 issued by Defendant

Secretary of State of the State of New Mexico Maggie T. Oliver (the "Secretary of State" or

"Defendant Oliver"). Plaintiffs assert that the Secretary of State's interpretation of the CRA to

impose the individual contribution limits in an election cycle on the transfer of funds from their

federal campaign committee account to their state campaign committee account is an

unconstitutional infringement of their First Amendment free speech and free association rights.

Defendant Attorney General Hector H. Balderas ("Defendant Balderas") filed a Motion to

Dismiss Complaint for Failure to State a Claim, Lack of Standing, and Immunity (ECF No. 26), and Defendant Oliver filed a Motion to Dismiss Claims against the Secretary of State in her Individual Capacity and Claims for Injunctive Relief (ECF No. 36). The Court held a hearing on the motion for preliminary injunction and Defendant Balderas' motion to dismiss. The parties represented at the hearing that an additional hearing to consider Defendant Oliver's motion to dismiss was not warranted. Having considered the parties' motions, briefs, oral arguments, evidence, and applicable law, the Court will grant Plaintiffs' motion for preliminary injunction and will deny the motions to dismiss.

## I.     FACTUAL BACKGROUND

### A. The Federal Election Campaign Act and the New Mexico Campaign Reporting Act

The Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431 *et seq.* ("FECA"), regulates federal campaign money and preempts any state laws with respect to election to federal office. *See* 52 U.S.C. § 30143(a); 11 C.F.R. § 108.7(b). In enacting FECA, Congress sought to limit and regulate political contributions and independent expenditures on behalf of candidates for federal office. *See Buckley v. Valeo*, 424 U.S. 1, 12-13 (1976). At all relevant times, FECA has required public disclosure of donors contributing more than $200 within the calendar year or election cycle. *See* 52 U.S.C. § 30104(b)(3)(A), (F)-(G).

FECA requires that all contributions received and expenditures made go through a principal campaign committee. *See id.* §§ 30102(e)(1), (f)(1), (h)(1). A "principal campaign committee" under FECA is "a political committee designated and authorized by a candidate" under § 30102(e)(1). *Id.* § 30101(5). Reporting under FECA for New Mexico-based candidates is required to both the Federal Election Commission ("FEC") and the New Mexico Secretary of State. *See* 52 U.S.C. §§ 30104 & 30113(a)-(b). Congress limited the contributions any person

2

could make to a candidate with respect to an election to an aggregate of $2,000, adjusted by the consumer price index. *See id.* § 30116(a)(1)(A) and (c). The parties agree that from 2009-2018 FECA contributions limits ranged from $2,400 to $2,700 for individuals and PACs. *See* Decl. of Andrea Todd-Goff ¶ 5, ECF No. 16-2; Hr'g Tr. 51:5-12, 141:22-142:1, Oct. 16, 2017 (hereinafter "Hr'g Tr.").[1]

Under FECA, candidates have to report to the FEC each donor's name, occupation, employer, amount donated, address, and their aggregate donation amount in the two-year election cycle, all of which is available to the public on the FEC website. *See* Hr'g Tr. 47:20-49:12, 53:7-14. FECA has a method of measuring pass-through contributions made by a donor's business entities, so that, for example, the sum total of all contributions given by the donor personally and all of his companies can be tracked. *See id.* 51:13-52:17; Decl. of Andrea Todd-Goff ¶ 9, ECF No. 16-2. FECA does not permit corporate contributions. Hr'g Tr. 51:2-13.

The CRA contains disclosure provisions for state campaigns, requiring public disclosure of the identities of all donors, except those donors giving anonymous cash donations of less than $100. *See* N.M. Stat. Ann. §§ 1-19-31(A), -34(B). The CRA requires that all contributions received and expenditures made go through a campaign committee for reporting purposes, but reporting is only to the New Mexico Secretary of State. *See id.* § 1-19-26(Q), -27. The CRA's provisions do not apply to any federal candidate subject to FECA. *See id.* § 1-19-37.

The New Mexico legislature amended the CRA in 1993 to add a provision expressly prohibiting the use in state election campaigns of contributions received in a federal election campaign. *See* 1993 N.M. Laws Ch. 46, § 6 (later codified at N.M. Stat. § 1-19-29.1(C)). Then-Congressman Bill Richardson challenged the constitutionality of this provision. *New Mexicans*

---

[1] Andrea Todd-Goff testified that her Declaration remained accurate in all but two respects as of the time of the hearing. Hr'g Tr. 49:24-50:22 (stating that bank balance and number of desired staffers had changed).

*for Bill Richardson v. Gonzales*, No. Civ. 93-1135 JP, Mem. Op. and Order (ECF No. 73), (D.N.M. Aug. 2, 1996). The Honorable James A. Parker ruled that § 1-19-29.1(C) violated the First Amendment because the provision's "[l]imitations on political campaign expenditures" infringed on core First Amendment rights and was not sufficiently narrowly tailored. *Id.* at 2-3. Judge Parker explained that, to further New Mexico's stated interest in shining the beneficial light of disclosure on sources of contributions, the legislature could have more carefully limited the statute's wording to say that a person can use funds acquired in federal election campaigns in state campaigns only if that person complies with state disclosure laws. *Id.* at 3.

In 2009, New Mexico enacted campaign contribution limits for statewide and non-statewide elections. *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1091 (10th Cir. 2013). The legislation was introduced in response to numerous pay-to-play corruption scandals involving New Mexico politicians. *See* Hr'g Tr. 83:8-91:25. These corruption scandals were widely and extensively reported in the news. *See id.*; Def.'s Hr'g Ex. 11-13.[2] The scandals had provoked considerable hostility by the public towards public officials. *See* Hr'g Tr. 94:25-95:19.

Since its effective date of November 3, 2010, the CRA prohibits persons and political committees from knowingly soliciting or accepting contributions in excess of the contribution limits provided for in the CRA. *See* N.M. Stat. Ann. § 1-19-34.7(C). The CRA defines a contribution to include "a … deposit of money … that is made or received for a political purpose…." *Id.* § 1-19-26(F). In contrast, the CRA defines "expenditure" as "a payment, transfer or distribution or obligation or promise to pay, transfer or distribute any money or other thing of value for a political purpose." *Id.* § 1-19-26(J). A "political purpose" in turn means "influencing or attempting to influence an election or pre-primary convention." *Id.* § 1-19-26(M).

---

[2] Courts may take judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Benak ex rel. Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n. 15 (3d Cir. 2006).

Section 1-19-34.7 of the CRA limits a person and a "political committee" from making contributions greater than $5,000 in aggregate during a primary election or $5,000 in aggregate during a general election to a candidate for statewide office, including the candidate's campaign committee. *See* N.M. Stat. Ann. § 1-19-34.7(A)(1) & (2). The contribution amounts are indexed for inflation, *see id.* § 1-19-34.7(D), and it has not been disputed that the CRA contribution limits in 2009 were $4,800, increasing every two years, to the current limit of $5,500 for any person, corporation, and political committee, including for a PAC, donating to a candidate running for statewide office. *See* Decl. of Andrea Todd-Goff ¶¶ 8, ECF No. 16-2; Hr'g Tr. 151:2-13, 210:19-211:9. The CRA defines a "political committee" as "two or more persons, other than members of a candidate's immediate family or campaign committee or a husband and wife who make a contribution out of a joint account, who are selected, appointed, chosen, associated, organized or operated primarily for a political purpose." *Id.* § 1-19-26(L). The CRA separately defines a "campaign committee" as "two or more persons authorized by a candidate to raise, collect or expend contributions on the candidate's behalf for the purpose of electing the candidate to office," *id.* § 1-19-26(D), but the meaning of "candidate" is limited to a person seeking office in an election covered by the CRA, *id.* § 1-19-26(E).

FECA is generally more stringent than the CRA, with stricter contribution limits than the CRA at all points relevant to this case. *See* Decl. of Andrea Todd-Goff ¶¶ 5, 8, ECF No. 16-2. Because the CRA does not forbid corporate donations, unlike FECA, the CRA currently permits a wealthy donor to donate up to $11,000 of personal funds in an election cycle, and give up to $11,000 for every single corporation and company he or she owns. *See* Hr'g Tr. 53:15-54:10. The CRA, unlike FECA, does not require campaign reports to contain the donor's employer or the aggregate amount for the election cycle. *See id.* 55:16-56:25; Pl.'s Hr'g Ex. B.

Under the CRA, a candidate for one state elective office may transfer contributions received to an account for a different state elective office. *See* N.M. Stat. Ann. § 1-19-29.1(A)(5) (permitting candidate to make expenditures of contributions received for "expenditures incurred by the candidate when seeking election to another public office covered by [the Act]"). *See also* Hr'g Tr. 112:19-24, 213:3-12, 257:5-13; Office of the Secretary of State, Candidate Information for Campaign Reporting, available at http://www.sos.state.nm.us/uploads/FileLinks/ca39fa62c82b4aa18c995f8740bcce9e/Candidate_Information_for_Campaign_Reporting_v2_1.pdf (last visited October 4, 2017) (providing, in campaign report form, box to check to "Please transfer my current remaining campaign balance listed in CFIS to my new campaign indicated below"). The Secretary of State's office has not instituted enforcement actions against candidates for state races who have transferred funds in excess of $11,000 from one state campaign account to another. *See* Hr'g Tr. 73:5-80:23, 226:4-228:8. The position of the Secretary of State's office is the transfers are permitted under the CRA because all transferred funds were raised pursuant to the CRA. *See id.* 213:3-22, 226:4-228:8. Nevertheless, because it is not uncommon for supporters to contribute to a candidate each time he or she runs for office, it is possible that the transfers of funds between accounts for different state elective office contain contributions, which if aggregated, could potentially have exceeded the individual contributions limits under the CRA. *See id.* 77:4-23, 178:8-19.

A person who violates the CRA may face civil and criminal penalties. *See* N.M. Stat. Ann. §§ 1-19-34.6, -36. If the secretary of state reasonably believes that a person has committed or is about to commit a violation of the CRA, she "shall refer the matter to the attorney general or a district attorney for enforcement." *Id.* § 1-19-34.6(A). *See also id.* § 1-19-34.4(G) ("The secretary of state may refer a matter to the attorney general or a district attorney for a civil

injunctive or other appropriate order or for criminal enforcement."). The CRA gives both the attorney general and district attorney authority to institute a civil action for any violation of the CRA or to prevent a CRA violation that involves an unlawful solicitation or the making or acceptance of an unlawful contribution. *Id.* § 1-19-34.6(B). They may seek civil penalties and forfeiture of any contribution received as a result of an unlawful solicitation or contribution, *id.* § 1-19-34.6(B)-(C), and institute criminal prosecutions for violations of the CRA, *id.* § 1-19-36.

The secretary of state also has authority granted by the CRA to "adopt and promulgate rules and regulations to implement the provisions of the [CRA];" *id.* § 1-19-26.2, "initiate investigations to determine whether any provision of the [CRA] has been violated," *id.* § 1-19-34.4(B), and conduct a thorough examination of filed reports to determine compliance with the CRA, *id.* § 1-19-32.1(A). "The secretary of state, in consultation with the attorney general, shall issue advisory opinions, when requested in writing to do so, on matters concerning" the CRA. *Id.* § 1-19-34.4(A). The secretary of state may levy administrative penalties for violations of the CRA, which may be reviewed in arbitration. *See id.* § 1-19-34.4(D)-(F).

### B.  Representative Pearce's Federal Campaign Funds

Plaintiff Steve E. Pearce is a sitting United States Congressman representing New Mexico's Second Congressional District in the House of Representatives, serving in this capacity from 2003 to 2009 and from 2011 to the present. Def. Oliver's Answer ¶ 10, ECF No. 27. People for Pearce ("PFP") is Representative Pearce's principal campaign committee, which is registered with and reports to the FEC and which he has used since 2009 to raise and spend funds in support of his federal campaigns for election and reelection. *See* Decl. of Andrea Todd-Goff ¶¶ 3-4, ECF No. 16-2; Def.'s Hr'g Ex. 1-7. Congressional election cycles are every two years and encompass a primary election usually in June and a general election in November, both in

the same even years. Hr'g Tr. 136:6-137:11.

Although FECA does not require disclosure of the identities of contributors giving less than $200, PFP has tracked this information in order to reconcile their records with their bank account, and is able to disclose the information. *See id.* at 62:11-63:21; Decl. of Andrea Todd-Goff ¶ 6, ECF No. 16-2. PFP has less than approximately $100 of truly anonymous contributions. *See* Decl. of Andrea Todd-Goff ¶ 6, ECF No. 16-2.

Under FECA, it is permissible for PFP to carry over contributions given during one election cycle for use in a subsequent election cycle. *See* Decl. of Andrea Todd-Goff ¶ 10, ECF No. 16-2. As of the date of the hearing, PFP's account contained approximately $910,000 in campaign contributions. Hr'g Tr. 50:2-7, 160:5-10. At no time when soliciting or accepting contributions for PFP did Representative Pearce or anyone associated with PFP ever promise or assert that the contribution would be used only in one specific election cycle or in pursuit of one specific elective office. *See* Hr'g Tr. 70:19-71:1; Decl. of Andrea Todd-Goff ¶ 7, ECF No. 16-2.

Contributions made to PFP beginning in 2009 and going forward were deposited into one PFP account, and expenditures for each campaign cycle were made from the same account. *See* Hr'g Tr. 127:20-134:23. After each election cycle, PFP had some leftover funds that it rolled over for the next election cycle. *See id.* Each contribution was not earmarked by the campaign to be spent for a particular purpose, so with each rollover, it is not possible to attribute the specific amounts rolled over to a particular contributor's donation or to attribute specific donations to particular expenditures made. *See id.* By way of example, the Ernst & Young PAC gave Representative Pearce $5,000 in aggregate donations in 2010, and gave additional donations to Representative Pearce in subsequent election cycles, in accordance with FECA, for a total aggregate donation amount of $30,000 from 2010 through 2016. *See* Hr'g Tr. 142:5-150:9;

Def.'s Ex. 1-7. Because expenditures were not earmarked from specific contributors, it is unknown how much of the $910,000 Representative Pearce seeks to transfer come from a specific donor, such as Ernst & Young PAC. *See* Hr'g Tr. 150:12-151:22. This uncertainty similarly exists for funds rolled over from one campaign to another under the CRA. *See id.* 77:4-23, 178:8-19. No contributions made before 2009 remain in the PFP account, and PFP stopped accepting contributions after the election day of Representative Pearce's last run for Congress to avoid receiving contributions arguably towards his gubernatorial run in a FECA account to prevent donors from being able to effectively contribute twice to his gubernatorial campaign by giving to PFP and then later to PFNM. *See* Decl. of Andrea Goff ¶ 3, ECF No. 16-2.

### C. Representative Pearce's Gubernatorial Campaign

Representative Pearce has announced his intention to run for the 2018 New Mexico gubernatorial election. Def. Oliver's Answer ¶ 10, ECF No. 27. A campaign committee under the CRA was set up for Representative Pearce's gubernatorial election, Pearce for New Mexico ("PFNM"). Decl. of Andrea Todd-Goff ¶ 8, ECF No. 16-2. Representative Pearce began fundraising for his gubernatorial election in July 2017, and as of October 9, 2017, he had raised a little more than one million dollars. *See* Hr'g Tr. 153:10-20; Pls.' Hr'g Ex. B. In the most recent reporting period under the CRA, Representative Pearce reported approximately $88,000 in expenditures. *See* Hr'g Tr. 125:8-22; Pls.' Hr'g Ex. B.

Representative Pearce's gubernatorial campaign currently has two full-time staffers working in New Mexico, Andrea Todd-Goff, a senior advisor to and finance director for Representative Pearce, and Paul Smith, Campaign Manager for PFNM. Hr'g Tr. 44:17-20, 158:8-14, 181:7-8. Representative Pearce's campaign would like to hire four more campaign staffers: a press secretary, two field directors, and a social media assistant. Hr'g Tr. 158:8-160:4,

164:12-22, 185:1-5. The positions would assist the campaign to increase Congressman Pearce's name recognition statewide, to develop relationships with the press, and to determine how best to get out the campaign's message. *See id.* 185:12-189:1. Two dark-money groups launched attack ads against Representative Pearce shortly after he entered the gubernatorial race, and had he had his PFP funds, the campaign would have paid for response ads to counteract the one-sided messaging. *See id.* 166:7-167:11, 190:6-191:23.

Representative Pearce's campaign has refrained from hiring the four positions and paying for ads, despite having around $900,000, because of the nature of political campaigns. *See id.* 158:8-161:2, 167:23-168:17. In political campaigns, large amounts of funds are needed near the time of the election to get out the vote and to advertise, so a campaign tries to preserve funds to ensure it has enough money for those crucial subsequent needs. *See id.* 167:23-168:17. In New Mexico, state-wide television advertisements cost about $200,000 per week, so campaigns need to hold onto the vast majority of their funds for later in the race. *See id.* 189:12-21, 200:1-201:5.

Campaign funds also serve as a demonstration of the strength of a candidate, particularly early in the race before polling begins, and large funds may deter additional opponents from deciding to run against the candidate. *See* id. 169:20-170:22, 182:23-183:14; Decl. of Andrea Todd-Goff ¶¶ 15, ECF No. 16-2. Although Representative Pearce does not currently have a challenger in the primary, the campaign needs to plan its budget for the possibility. *See* Hr'g Tr. 170:10-171:2. The strength of a candidate, measured early in the campaign largely by campaign funds, affects recruiting for campaign staff, as the top staffers generally want to work for strong campaigns with the greatest chance of winning. *See id.* 183:5-24, 186:9-187:19. The pool of talent shrinks closer to the election, so the sooner a campaign can afford to bring on staffers, the better the chance of recruiting top, experienced talent. *See id.* Representative Pearce wishes to

transfer the campaign contributions in his PFP account into his PFNM account to use in his gubernatorial campaign immediately to hire the additional staff and pay for advertising. *See id.* 158:8-161:2, 172:12-22, 184:19-25.

By way of comparison, New Mexico Congresswoman Michelle Lujan Grisham is also currently running for New Mexico governor. Hr'g Tr. 123:13-24. On October 9, 2017, Representative Lujan Grisham reported having over $1.3 million in contributions and total expenditures of over $519,000. *See* Pl.'s Ex. K; Hr'g Tr. 125:8-22. She has raised approximately $2.2 million total with approximately $1.6 million on hand. *See* Hr'g Tr. 192:11-15. Representative Pearce has considered Congresswoman Lujan Grisham's campaign funds in determining his own campaign expenditures, and if he had his federal funds, the campaign would be more comfortable increasing its expenditures. *See id.* at 192:2-193:13. Although there are multiple challengers vying for the Democratic nomination for governor, the money they spend increasing their own name recognition gives an advantage over Representative Pearce, so he would like to spend money on advertising now. *See id.* 204:16-205:12.

### D. The July Advisory Opinion

Before Representative Pearce declared his candidacy for governor, in April 2016 William Canfield, counsel for PFP, asked the Secretary of State whether transfers from a candidate's FECA account into a CRA account were permitted, and if so, if they were subject to restrictions or limitations. *See* Letter from Amy B. Bailey dated June 15, 2016, ECF No. 1-2 at 72 of 82; Letter from William B. Canfield III dated June 20, 2017, ECF No. 76 of 82. On June 15, 2016, Amy B. Bailey, General Counsel for the Office of the Secretary of State, responded affirmatively that a federal officeholder may transfer funds from a FECA candidate campaign committee to a state candidate campaign committee, noting that the Section 1-19-29.1(C) restriction had been

declared unconstitutional in a federal court. *See* Letter from Amy B. Bailey dated June 15, 2016, ECF No. 1-2 at 72-73 of 82. Ms. Bailey, however, stated that there were restrictions on the transfer of such funds, citing Section 1-19-34.7's limitations on contributions a candidate or political committee may receive, and giving as an example the $5,400 maximum aggregate contribution limit from a single donor for each election during the cycle. *Id.* In response to Mr. Canfield's inquiry whether the balance of funds in a FECA campaign committee could be considered the candidate's personal funds, Ms. Bailey replied, "No. The FECA candidate campaign committee is a campaign committee under the CRA." *Id.* Ms. Bailey further stated that any contribution that is not a candidate's personal funds is subject to the limits of Section 1-19-34.7(A). *Id.*

Subsequently, PFP sought the current Secretary of State's position on the same issues, and after back-and-forth correspondence, *see* Compl. Ex. B, ECF No. 1-2 at 74-79 of 82, New Mexico Deputy Secretary of State John Blair wrote a letter to Mr. Canfield dated July 19, 2017, setting forth Secretary of State Oliver's position (hereinafter "the July 2017 Advisory Opinion"), *see id.* at 80-82 of 82. Mr. Blair stated, "[T]he official position of this office continues to be that Congressman Steve Pearce may transfer $5,500 from his FECA account to a CRA account for a gubernatorial campaign both for the 2018 primary election and for the 2018 general election." *Id.* at 80 of 82. Mr. Blair wrote that the CRA "only contemplates the term 'transfer' in terms of an expenditure made under the CRA when seeking an election for an office covered by the CRA," and that the CRA does not provide any process or guidance whereby funds can be transferred into a campaign account governed by the CRA from a campaign account not governed by the CRA. *Id.* at 81 of 82. He explained that Section 1-19-34.7(A)(2)(b) uses the term "contribution" when discussing the limits of a contribution from one political committee to another, and that

because "contribution" under the CRA includes a "deposit of money," the Secretary of State concluded that the desired "transfer" from the FECA account is a "deposit of money" subject to contribution limits. *Id.* Mr. Blair concluded: "Your request to transfer the entirety of Congressman Pearce's FECA account would be to do so without restriction or limitation in direct contravention of Ms. Bailey's letter and the CRA." *Id.* at 82 of 82.

The Secretary of State's office also advised Congresswoman Lujan Grisham that the transfer of her federal campaign funds were likewise subject to the CRA contribution limits. *See* Hr'g Tr. 213:23-215:9.

### E.  Federal Complaint

On July 20, 2017, People for Pearce and Representative Pearce filed a Complaint for Injunctive and Declaratory Relief, and Attorneys' Fees against, according to the caption, Secretary of State Oliver in her individual and official capacities, Attorney General Balderas in his individual and official capacities, and Fifth Judicial District Attorney of New Mexico Dianna Luce in her official capacity. Compl. 1, ECF No. 1. In the body of the Complaint, Plaintiffs assert claims for declaratory and injunctive relief against all Defendants in their official capacities for violations of the First Amendment and the Equal Protection Clause. *See id.* ¶¶ 64-80. They seek to enjoin Defendants from enforcing the CRA's campaign-contribution limits against any transfer of funds from PFP to Representative Pearce's CRA campaign committee. *Id.* ¶¶ 70, 79.

On August 31, 2017, Plaintiffs filed a motion for preliminary injunction, moving the Court to enjoin the Defendants (i) from enforcing under Sections 1-19-34.4, -34.6, and -36 of the CRA the restrictions described in the July 2017 Advisory Opinion, (ii) from imposing any limitations on the transfer of PFP funds to Representative Pearce's CRA account, and (iii) from

levying any restrictions on the subsequent use of those funds beyond those restrictions that apply equally to funds originally raised under state law. Pls.' Mot. 2, 23, ECF No. 16. Given that 2018 is a gubernatorial election year in New Mexico, Plaintiffs assert they have a limited timeframe in which their desired speech and association can influence the election, and thus, the Court should immediately issue a preliminary injunction. Defendants oppose the preliminary injunction, and Defendants Balderas and Oliver each subsequently moved to dismiss the claims against them. *See* Def. Balderas' Mot. to Dismiss, ECF No. 26; Def. Oliver's Mot. to Dismiss, ECF No. 36. This Court held a hearing on the motion for preliminary injunction on October 16, 2017. Defendants stated at the hearing that the Court could decide the motions to dismiss on the briefs. Hr'g Tr. 273:1-8.

## II.     MOTIONS TO DISMISS

When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or for failure to state a claim under Rule 12(b)(6), the court must accept the complaint's factual allegations as true and construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Wyoming v. United States*, 279 F.3d 1214, 1222 (10th Cir. 2002).

### A.  Defendant Balderas' Motion to Dismiss

Defendant Balderas moves to dismiss the complaint for lack of standing and failure to state a claim. He argues that Plaintiffs' claims are not ripe for adjudication because they rest upon contingent future events that may never occur at all, and that there are no allegations that he has initiated an investigation of Plaintiffs' campaign or fundraising practices. He also asserts the Court should abstain from consideration of the case under *Younger v. Harris*, 401 U.S. 37 (1971). Finally, Defendant Balderas contends the Court must dismiss the individual capacity

claims against him, to the extent they are alleged, based on prosecutorial and qualified immunity.

### 1. Standing

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, the party invoking federal jurisdiction bears the burden of establishing (1) an injury in fact that is concrete and particularized as well as actual or imminent, (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision. *Id.* at 560-61. Although allegations of possible future injury do not satisfy the injury-in-fact requirement, "a plaintiff need not 'expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.'" *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1087–88 (10th Cir. 2006) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). The Tenth Circuit has recognized that "a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'" *Id.* at 1088 (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).

Ripeness also bears on a court's subject matter jurisdiction. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995). Ripeness is a question of timing, requiring the party invoking jurisdiction to show that the issue is fit for judicial resolution and that the parties will suffer hardship from withholding judicial consideration. *Id.* at 1499. Courts have often found First Amendment cases ripe because of the special need to protect against any inhibiting chill. *Id.* at 1500.

Representative Pearce has begun his campaign for governor, and specifically requested a

written opinion from the Secretary of State on the legality under the CRA of the transfer of funds at issue here. The Secretary of State issued the July 2017 Advisory Opinion classifying PFP as a political committee subject to contribution limits, and expressly stated her position that Representative Pearce may only deposit $5,500 from his FECA account to a CRA account for his gubernatorial campaign once for the primary election and a second time for the general election. Opinion Letter, ECF No. 1-2 at 82 of 82. The letter made clear the Secretary of State's position that transferring more than $11,000 total would be "in direct contravention" of the CRA. *Id.* Under the CRA, the Secretary of State, "in consultation with the attorney general, shall issue advisory opinions, when requested in writing to do so." N.M. Stat. Ann.§ 1-19-34.4(A). Construing all facts and inferences in Plaintiffs' favor, there is reason to believe that the Secretary of State's Office issued the July 2017 Advisory Opinion after consultation with Defendant Balderas.

The Secretary may refer violations of the CRA to the Attorney General or District Attorney for prosecution. Neither Defendant Balderas nor Defendant Luce[3] has disavowed the Secretary of State's interpretation of the CRA as set forth in the July 2017 Advisory Opinion. Nor has Defendant Balderas or Defendant Luce disavowed enforcing the CRA against Plaintiffs should they transfer the funds to a CRA account. Notably, Defendant Balderas admits he has pursued an aggressive agenda of protecting New Mexicans against corruption and campaign finance abuse. Def. Balderas's Mot. to Dismiss 2, ECF No. 26. Plaintiffs thus face a direct and immediate dilemma of either transferring the funds to spend in the gubernatorial campaign and risk prosecution by Attorney Balderas or District Attorney Luce or foregoing use of the funds and the exercise of their First Amendment rights.

---

[3] Although Defendant Luce has not filed a motion to dismiss, she raised the issue of standing in responding to Plaintiffs' motion for preliminary injunction. *See* Def. Luce's Resp. 2, ECF No. 24.

Additionally, the issues are fit for judicial resolution at this time. The facts in question are not based on contingent future events, but rather, on the past collection and reporting of campaign contributions by Plaintiffs, and on the past and present grounds for the state interest in enforcing the CRA contribution limits to the requested transfer. The issues are concrete and particularized and do not require analysis of an abstract, hypothetical scenario. The requested relief in this case would also redress Plaintiffs' asserted injury.

Because the Secretary of State has unequivocally indicated that Plaintiffs will violate the CRA if they transfer the funds at issue, and the transfer may subject Plaintiffs to civil or criminal penalties through enforcement actions brought by the Attorney General or District Attorney Luce, Plaintiffs have "suffered the constitutionally sufficient injury of self-censorship through the chilling of protected First Amendment activity, rendering [their] as-applied challenge to [the CRA] justiciable." *Colorado Right to Life Committee, Inc. v. Coffman*, 498 F.3d 1137, 1145 n.6 (10th Cir. 2007) ("CRLC also suffers Article III injury when it must either make significant changes to its operations to obey the regulation, or risk an investigation and citation."). *See also New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1501-02 (10th Cir. 1995) (concluding that Congressman Richardson's fears of prosecution were reasonable and ripe for review, even though the record contained no affirmative evidence that prosecution for violating the statute was imminent, where New Mexico had not affirmatively disavowed any intention of bringing criminal prosecution against him should he spend federally raised money for pre-announcement activity for state elective office). Plaintiffs have established Article III standing in this case.

### 2. *Younger* Abstention

Defendant Balderas argues that, because Plaintiffs allege that there is a current imminent

threat of prosecution or at least an investigation involving the Attorney General, the Court should dismiss the case based on the *Younger* abstention doctrine. *Younger* abstention permits federal courts to abstain from hearing a case if (1) a state judicial proceeding is ongoing, (2) an important state interest is at stake, and (3) there is an adequate opportunity in the state case to raise federal claims. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1242 (10th Cir. 2001). Here, there is no state judicial proceeding that is ongoing, so *Younger* abstention does not apply. *See id.* at 1242-43.

### 3. Whether complaint fails to state a claim

Defendant Balderas next argues that there are insufficient facts to state a claim against him. Defendant Balderas asserts that the only allegations against him are based on his statutory authority to bring criminal enforcement proceedings under the CRA and the presumption, based on the CRA, that Defendant Oliver formed her opinion in consultation with him. For the reasons discussed *supra*, there is standing to proceed against Defendant Balderas in his official capacity for pre-enforcement injunctive relief based on the credible threat of prosecution should Plaintiffs transfer all the funds from PFP into the PFNM account. Plaintiffs have stated a claim under the First Amendment against Defendant Balderas in his official capacity.

### 4. Individual capacity claims

Defendant Balderas requests dismissal of the claims against him in his individual capacity for reasons of absolute and qualified immunity. He acknowledges, however, that Plaintiffs do not identify any count in which they seek relief from him in his individual capacity; rather, Plaintiffs identified the Attorney General in his individual capacity in the case caption only. Indeed, Plaintiffs admit that "there are currently no individual-capacity claims against any of the Defendants." Pls.' Resp. to Def. Balderas's Mot. to Dismiss 2, ECF No. 34. Because the

body of the current Complaint does not contain individual capacity claims against Defendant Balderas, there are no individual capacity claims against him to dismiss, and the Court will deny the motion to dismiss on grounds of mootness. The Court therefore need not reach Defendant Balderas's immunity arguments regarding potential, but not yet asserted, claims.

### B. Defendant Oliver's Motion to Dismiss

Defendant Oliver argues that any claims against her in her individual capacity should be dismissed for futility and that Plaintiffs' request for permanent injunctive relief should be dismissed given the presumption that government officials will comply with any declaratory judgment. For the reasons given above, the Court concludes there are no claims against Defendant Oliver in her individual capacity to dismiss so the Court will deny the request to dismiss individual capacity claims for mootness. The Court will not consider Defendant Oliver's futility arguments at this juncture. Although neither Defendant Balderas nor Defendant Oliver moved to strike "individual capacity" language in the caption, the Court will nonetheless strike as surplusage all reference to individual capacity claims in the caption for purposes of clarity.

Regarding permanent injunctive relief, Defendant Oliver relies on the Supreme Court's decision in *Wooley v. Maynard*, 430 U.S. 705 (1977):

> We have recognized that although (o)rdinarily . . . the practical effect of (injunctive and declaratory) relief will be virtually identical, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary. It is correct that generally a court will not enjoin the enforcement of a criminal statute even though unconstitutional, since (s)uch a result seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of Younger. But this is not an absolute policy and in some circumstances injunctive relief may be appropriate. To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights.

*Id.* at 711-712 (internal quotations and citations omitted) (but explaining reluctance to say that

district court was limited to granting declaratory relief where three successive prosecutions were undertaken by state against plaintiff in span of five weeks). Defendant Oliver argues that the facts of the complaint do not amount to exceptional circumstances and necessity, and accordingly, the Court should dismiss Plaintiffs' request for permanent injunctive relief.

Plaintiffs assert that the allegations establish plausible grounds to support permanent injunctive relief, and alternatively that the dismissal is premature given that discovery has not begun. According to *Wooley*, injunctive relief against enforcement of a criminal statute is not prohibited absolutely, but requires a showing of exceptional circumstances and necessity. Plaintiffs have alleged that the Secretary's interpretation ignores Judge Parker's declaratory judgment by effectively prohibiting the use of federal campaign funds in a state race. *See* Compl. ¶¶ 6-9, ECF No. 1. Although the Secretary has affirmatively stated in the briefs that she will comply with any final declaratory judgment, she has moved to dismiss Plaintiffs' request for permanent injunctive relief under Rule 12(b)(6). The Court finds that, construing the facts of the complaint and all inferences to be drawn therefrom in the light most favorable to Plaintiffs, Plaintiffs have sufficiently pled a plausible claim for injunctive relief. Moreover, as discussed *infra*, the Court finds that issuance of a preliminary injunction is appropriate in this case. The Court therefore finds it is premature to foreclose a potential remedy altogether before discovery proceeds and will not dismiss Plaintiffs' request for permanent injunctive relief at this time.[4]

Where a plaintiff seeks to challenge the constitutionality of a state statute and there are no pending state proceedings against the plaintiff, the plaintiff is entitled to have his claims for preliminary injunctive relief considered without regard to *Younger*'s restrictions. *See Doran v.*

---

[4] At the preliminary injunction hearing, counsel for Defendant Balderas represented that Defendant Balderas would defer to this Court's decision so imposing injunctive relief is unnecessary. Hr'g Tr. 266:15-268:1. The Court's decision does not reflect its views on whether the Secretary's and Attorney General's representations are sincere; rather, the Court merely concludes that eliminating permanent injunctive relief at the motion to dismiss stage is not proper based on the allegations in the Complaint.

*Salem Inn, Inc.*, 422 U.S. 922, 930-31 (1975). As the Supreme Court explained, "prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction; unless preliminary relief is available upon a proper showing, plaintiffs in some situations may suffer unnecessary and substantial irreparable harm." *Id.* at 931. Defendant Oliver has defended the request for preliminary injunction on the merits and does not contend that it is barred by *Younger*, because no prosecution is pending. Def. Oliver's Reply 8, ECF No. 49. The Court will therefore turn to the merits of Plaintiffs' preliminary injunction request.

## III.     PRELIMINARY INJUNCTION

### A.  STANDARD

A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries the burden of showing a right to relief that is clear and unequivocal. *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016); *Schrier v. University of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To obtain a preliminary injunction the moving party must demonstrate four elements: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

The movant, however, must satisfy a heightened burden if the requested preliminary injunction is one of three disfavored types "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). These disfavored injunctions include: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the

relief that it could recover at the conclusion of a full trial on the merits. *Id.* A party seeking a disfavored injunction must demonstrate a substantial likelihood of success on the merits and make a strong showing that the balance of harms tips in the movant's favor and the preliminary injunction is not adverse to the public interest. *Id.* at 980.

Defendants argue that the requested injunction implicates all three disfavored injunctions. The Court need not decide this issue, because even assuming the heightened standard applies in this case, for the reasons discussed herein, Plaintiffs have met their burden. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009) (declining to determine whether district court's injunction disrupted status quo between parties, because plaintiff met its burden even under heightened standard). *See also Diné Citizens*, 839 F.3d at 1283 (applying "substantial likelihood of success on the merits" standard for preliminary injunction).

### B. ANALYSIS

#### 1. First Amendment

##### a. Substantial Likelihood of Success on the Merits

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Discussion of public issues and debate on the merits of candidates for political office are essential to the operation of democracy. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976); *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). Accordingly, the First Amendment provides fundamental protections against contribution and expenditure limitations for political campaigns. *King*, 741 F.3d at 1092 ("the financing and spending necessary to enable political speech receives substantial constitutional protection").

In the seminal case of *Buckley v. Valeo*, the Supreme Court drew distinctions between expenditures and contributions. *Buckley*, 424 U.S. at 19-21. "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. Consequently, "[e]xpenditures are core political speech directly advancing public debate, subject to strict scrutiny." *King*, 741 F.3d at 1093. To survive constitutional challenge, limitations on expenditures must be narrowly tailored to advance a compelling state interest. *Id.*

In contrast, a limitation upon the amount that a person or group may contribute to a candidate only marginally restricts the contributor's ability to engage in free communication. *Buckley*, 424 U.S. at 20. "[C]ontribution limits must be closely drawn to serve a sufficiently important interest, namely, the prevention of corruption or the appearance of corruption." *King*, 741 F.3d at 1103 (internal quotations omitted). The Supreme Court's explanation of the difference between expenditures and contributions is significant to the determination of whether the restriction on Plaintiffs' desired transfer of funds constitutes a contribution or expenditure limitation:

> A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Buckley*, 424 U.S. at 21 (internal footnote omitted).

The Secretary of State's interpretation of the CRA to limit the amount Plaintiffs can transfer from their federal campaign account to the state campaign account is a restriction on expenditures. Representative Pearce already controls the collectively pooled contributions and is seeking to use the funds for his own speech; therefore, the transfer itself is not a symbolic expression of support. The Secretary of State's restriction instead limits Representative Pearce's ability to directly communicate his message. As a limitation on expenditures, the Secretary of State's interpretation is subject to strict scrutiny and must be narrowly tailored to advance a compelling state interest. *Cf. Service Employees Intern. Union, AFL-CIO, CLC*, 955 F.2d 1312, 1322 (9th Cir. 1992), *overruling on other grounds recognized by Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1091-92 & n.2 (9th Cir. 2003) (although not disputed by appellants, agreeing with district court that "ban on intra-candidate transfers operates as expenditure limitation because it limits the purposes for which money raised by a candidate may be spent"); *New Mexicans for Bill Richardson*, No. Civ. 93-1135 JP, at 2-3 (construing prohibition on transfer of federal campaign funds as a restriction on political campaign expenditures subject to exacting scrutiny). *See also Shrink Missouri Government PAC v. Maupin*, 71 F.3d 1422, 1427-28 (8th Cir. 1995) (concluding that "spend-down provision" designed to address practice of carrying over "war chests" of campaign funds for future elections effectively limited expenditures in future elections and did not survive strict scrutiny).[5]

---

[5] Defendants cite *Alabama Democratic Conference v. Broussard*, 541 F. App'x 931 (11th Cir. 2013), and *State v. Alaska Civil Liberties Union*, 978 P.2d 597 (Alaska 1999), in support of their argument that the prohibition of transfer of funds constitutes a "contribution" limitation. *Broussard*, however, involved the transfer of funds between PACs, unlike here where the transfer is between principal campaign accounts controlled by the same candidate, just for a different office. *Broussard* is thus distinguishable. The provision at issue in *Alaska Civil Liberties Union* was a "spend down" requirement, prohibiting a candidate from carrying forwarded unused contributions to the next campaign. *Alaska Civil Liberties Union*, 978 P.2d at 631. The Alaska Supreme Court concluded that the carry-forward restriction directly limited expenditures, burdening speech, and thus required the State to have a compelling

The Supreme Court so far has recognized only preventing *quid pro quo* corruption or the appearance of *quid pro quo* corruption as valid governmental interests that can support restrictions on political speech. *See King*, 741 F.3d at 1094 (citing *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 359 (2010)). In this case, former State Senator Dede Feldman testified to the general corruption concerns in response to which the New Mexico legislature passed the CRA, evidence that Plaintiffs did not dispute and which the Court accepts. Critically, however, Plaintiffs do not present a facial challenge to the CRA, but a specific as-applied challenge to the Secretary of State's interpretation that the CRA's contribution limits for a political committee apply to a transfer of funds from a federal campaign account subject to FECA to a CRA account for the same candidate, even when the candidate seeks to transfer only those funds that, when collected, also complied with CRA contribution limits and disclosure requirements.

Defendants have not presented evidence specifically linking the State interest in preventing *quid pro quo* corruption or the appearance thereof to the type of transfer of funds at issue here. *See* Hr'g Tr. 101:19-103:15. Although State Senator Feldman testified that all transfers of large amounts of money to politicians do not sit well with the public, *id.* 111:3-25, the record does not show direct examples of votes being exchanged for intra-candidate transfers of campaign funds, where those funds were already subject to contribution limits. As the Supreme Court stated in *Citizens United*, ingratiation and access are not corruption. *Citizens United*, 558 U.S. at 360. To justify limitations on political speech, the restriction must be linked to preventing *quid pro quo* corruption, or the appearance of *quid pro quo* corruption. *See id.* at 360-61. *See also McCutcheon v. Federal Election Com'n*, 134 S.Ct. 1434, 1451 (2014). An interest in preventing the appearance of general influence is not enough. *See McCutcheon,* 134

interest to justify the burden. *Id.*

S.Ct. at 1451; *Citizens United*, 558 U.S. at 360.

Although the name of the campaign committee differs, the entity making the transfer of funds and the entity receiving the funds is functionally the same -- the principal campaign committee of Representative Pearce. There is thus no concern about *quid quo pro* corruption regarding the actual entities making and receiving the transfer. Although the record contains some evidence of a State concern about *quid pro quo* arrangements and the appearance of *quid pro quo* corruption stemming from the contributions of individual donors to politicians, that concern is directed to a point occurring earlier in the process when the contributions were initially made by the individual donors and subject to FECA. The parties agree, however, that FECA imposes more stringent contribution limits and reporting requirements in all but a few minor exceptions,[6] and perhaps most significantly, FECA imposes lower contribution limits than the CRA for each category of donor throughout PFP's existence.

Plaintiffs have represented that they intend to comply with the contribution limits imposed by the CRA and only seek to transfer CRA-complaint funds from the federal account to the state account. Pls.' Mot. 18, ECF No. 16; Pls.' Reply 1-2, ECF No. 32. Plaintiffs have limited their request for preliminary injunction to prohibiting the levying of restrictions on the use of post-transfer funds "beyond those restrictions that apply equally to funds that were originally raised under state law." Pls.' Mot. 2, ECF No. 16. The requested injunction would thus not

---

[6] For example, FECA requires disclosure of donors who contribute more than $200, while the CRA requires public disclosure of identities of all donors except those giving anonymous cash donations of less than $100. *Compare* 52 U.S.C. § 30104(b)(3)(A), (F)-(G), *with* N.M. Stat. Ann. §§ 1-19-31(A), -34(B). Despite that FECA does not require it, PFP has tracked the information of donors giving less than $200 and is able to disclose the information to conform to the CRA. *See* Decl. of Andrea Goff ¶ 6, ECF No. 16-2. PFP has less than $100 of truly anonymous contributions. *Id.* Anonymous cash donations under $100 are permitted under the CRA. N.M. Stat. Ann. §§ 1-19-31(A), -34(B). Given this record indicating that Plaintiffs are substantially likely to demonstrate that they complied with the CRA for the vast majority, if not all, of the funds in the PFP account, *see id.,* Defendants' interest in ensuring that the CRA contribution limits for individual donors per election and disclosure requirements are followed does not justify the total ban in transferring Plaintiffs' campaign funds in excess of $11,000. Moreover, to address those concerns, the Secretary of State could have more narrowly tailored her advisory opinion to prohibit only the transfer of any federal donations that were not collected or disclosed in compliance with the CRA.

enjoin Defendants from otherwise enforcing the CRA to ensure that all contributions received and transferred from PFP to PFNM satisfied the CRA contribution and disclosure provisions for individual donors per election. The interest in alleviating the corrupting influence of large contributions was thus substantially already served by FECA when the donors initially contributed the funds, so the more stringent federal contribution limits prevent donors from obtaining or from being perceived as obtaining influence over the candidate in a subsequent election. *Cf. Anderson v. Spear*, 356 F.3d 651, 670-71 (6th Cir. 2004) (holding that post-election contribution ban was unconstitutional because it was not closely drawn to avoid unnecessary abridgment of associational freedoms where state's contribution limits already prevented late-comers from being perceived as obtaining, or from actually-obtaining, influence on elected officials, substantially mitigating concerns about donors purchasing undue influence). Consequently, based on the current record, the Secretary of State's interpretation of the application of the CRA contribution limits to the desired transfer of funds, as stated in her July 2017 Advisory Opinion, is not narrowly tailored to the state interest in combatting *quid pro quo* corruption or the appearance thereof. *Cf. Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751 (2011) ("Burdening a candidate's expenditure of his own funds on his own campaign does not further the State's anticorruption interest…. The matching funds provision counts a candidate's expenditures of his own money on his own campaign as contributions, and to that extent cannot be supported by any anticorruption interest.").

Defendant Oliver nonetheless argues that the State has an interest in preventing corruption arising from an individual donor's accumulated funds over multiple election cycles, which in aggregate may exceed the CRA's contribution limits for the New Mexico state-wide election, from being used in one race. As Plaintiffs correctly point out, the CRA permits

contributors to donate up to the limit in each election cycle and to rollover accumulated funds for the next election cycle, so there is no inherent violation of the CRA with the accumulation of donations over multiple election cycles. This case is therefore not one in which the federal candidate seeking to transfer funds is attempting to avoid contribution limits or disclosure restrictions under state law; instead, the federal candidate's donations were collected at the time in accordance with the CRA, and the accumulation of donations over multiple election cycles is likewise permitted under the CRA. Moreover, the State does not appear concerned about the purported corruption that this accumulation may present in state races, as it is expressly permitted under the CRA, undermining the argument that their interpretation furthers the interest in reducing corruption.

Defendant Oliver argued at the hearing that the State need not close every loophole to render the loopholes it fixes constitutional. She argues that it makes sense for the State to address first the problem of accumulation of donations in federal races, because there is a larger fundraising base at the federal level that creates undue influence on the candidate or the appearance of corruption. *See* Hr'g Tr. 252:11-254:5. Where, however, the burdens on contributors in a federal campaign are more stringent than in a state campaign, the concern of *quid pro quo* corruption may actually be less likely to occur at the federal level, given that each federal donor's individual contribution is, as a ratio to total contributions, diluted and not as great as at the state level, assuming that there is indeed a smaller state fundraising base. The Court cannot find, based on the record before it, that the larger fundraising base necessarily creates a greater likelihood of *quid pro quo* corruption or the appearance thereof. *Cf. McCutcheon*, 134 S.Ct. at 1451 ("And because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government

may not seek to limit the appearance of mere influence or access.").

Defendant Oliver also asserted at the hearing that certain statewide elections are term-limited, unlike at the federal congressional level, resulting in a reduction of accumulated funds to rollover. *See* Hr'g Tr. 253:17-23. Defendants, however, did not present evidence or argument on which elected offices are term-limited and whether that creates a large disparity in the accumulated funds of individual donors in state versus federal races. Even if the argument were substantiated by the evidence, the Court finds that the record does not support the State's argument that the restriction on transfer of federal funds is narrowly tailored to further the State's anticorruption interest when the donors complied with the more stringent requirements in FECA for each election cycle.[7]

The State's purported interest in addressing the undue influence of the larger federal fundraising base instead appears to be an effort to level the playing field between federal and state candidates running for state office. The Supreme Court, however, has repeatedly rejected the argument that the government has a compelling state interest in leveling the playing field to justify burdens on political speech. *Bennett*, 564 U.S. at 749. As the Supreme Court explained:

> "Leveling the playing field" can sound like a good thing. But in a democracy, campaigning for office is not a game. It is a critically important form of speech. The First Amendment embodies our choice as a Nation that, when it comes to such speech, the guiding principle is freedom—the "unfettered interchange of ideas"—not whatever the State may view as fair.

---

[7] In *Alaska Civil Liberties Union*, the Alaska Supreme Court upheld a carry-forward restriction based on the justification that the State sought to prevent candidates from taking contributions in one campaign to avoid contribution limits in the next one. *See* 978 P.2d at 631-632. The record there showed "evidence of substantial carryovers that appear large in comparison with the total projected expense of campaigns for contested seats." *Id.* at 632. In contrast, Defendants' limitation in this case only functions to prohibit transfers of campaign funds amassed in federal campaigns, and they readily acknowledge state campaign funds can carry-over to other state races, severely undermining the sincerity of their purported interest in preventing candidates from avoiding valid contribution limits. Nevertheless, even accepting at face value Defendants' interest in preventing the avoidance of valid contribution limits, the Court is unconvinced based on the record before it that the limitation of the transfer of all but $11,000 of federal campaign funds is sufficiently narrowly tailored to the purported justification in preventing *quid pro quo* corruption, or the appearance of it, to survive strict scrutiny.

*Id.* at 750. The government cannot restrict the speech of federal candidates to enhance the relative voice of the state candidates. *Cf. Buckley*, 424 U.S. at 48-49 ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment").

Plaintiffs have therefore met their heightened burden of showing that they are likely to succeed on the merits of their First Amendment claim that the CRA's $5,500 per-election campaign contribution limit is unconstitutional as applied to restrict the transfer of funds from the PFP account to Representative Pearce's PFNM account to only $11,000 per election cycle, and that the CRA's restrictions on use of expenditures of contributions received are unconstitutional as applied to restrict the subsequent use of funds transferred from the PFP account to the PFNM account in excess of $11,000 beyond those restrictions that apply equally to funds that were originally raised under state law.

### b. Likelihood that the moving party will suffer irreparable harm

Plaintiffs seeking a preliminary injunction must demonstrate that irreparable harm is likely in the absence of an injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotations omitted). *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This Court has concluded that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that not permitting PFP and Representative Pearce to transfer and use all donations previously collected in accordance with both FECA and CRA contribution and disclosure requirements violates his First Amendment rights to transform that money into

speech and is impairing and chilling his speech in the gubernatorial election. Accordingly, Plaintiffs have met their heightened burden of showing an irreparable injury absent a preliminary injunction. *See Planned Parenthood Association of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) ("We in turn conclude that the likelihood that PPAU will suffer a violation of its First Amendment rights if the Directive is left in place, standing alone, gives rise to an irreparable injury.")

Moreover, Plaintiffs have shown the need for the funds to hire staff and pay for advertising campaigns to begin their messaging immediately. Although the evidence shows Plaintiffs had approximately $900,000 in funds in PFNM at the time of the hearing, Plaintiffs also established the high cost associated with gubernatorial campaigns, particularly for advertising, which can cost $200,000 per week to run state-wide television advertisements to convey information concerning Representative Pearce's candidacy. Plaintiffs presented evidence that dark money groups have already run advertisements targeting him and that he needs the funds to pay for advertising now to counteract the negative messaging and to ensure enough funds for necessary advertising at the end of the campaign. Plaintiffs also need the funds to pay for four staffers. Plaintiffs have thus satisfied their burden of establishing clearly and unequivocally that the deprivation of their constitutional rights through the limitation on use of their funds before a trial on the merits can be held will cause them irreparable harm.[8]

### c. Balance of equities

Defendants argue that enjoining their efforts to prevent corruption and the appearance of corruption in the gubernatorial election weighs in favor of rejecting the request for a preliminary injunction. Defendants, however, have not shown the Court that the Secretary of State's

---

[8] Defendants contend that refunding federal donors' money and asking them to recontribute to Representative Pearce's state campaign would avoid irreparable harm. The Court is not convinced that the refund-and-recontribute procedure mitigates the First Amendment harm.

interpretation furthers the interest in preventing *quid pro quo* corruption where all the funds at issue are already in the control of the candidate, and were previously subject to FECA with its more stringent limitations. As discussed above, the injunction would not shield from scrutiny the funds to determine if, when donated, they indeed were CRA-complaint. Furthermore, Section 1-19-34.6(B) of the CRA permits the attorney general or district attorney to institute a civil action for violations of the CRA, remedies for which include assessing penalties for each violation, and forfeiture of any contribution received unlawfully. Consequently, if Plaintiffs lose after a trial, Defendants have a method of recovering unlawful contributions. The threatened injury to Plaintiffs' First Amendment rights therefore outweighs the purported harm to Defendants. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (stating that, when law is likely unconstitutional, interests of those the government represents, such as voters, do not outweigh plaintiff's interest in having his constitutional rights protected).

### d. Public interest

As the Tenth Circuit has observed, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (citations omitted). The Supreme Court has repeatedly made clear that the "First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United*, 558 U.S. at 339 (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)). The public has a right to hear speech and use information during campaigns to protect "enlightened self-government." *Id.* Because the funds at issue are necessary for Representative Pearce to increase the quantity of his campaign speech for the 2018 gubernatorial race, the public interest in protecting the First Amendment is served by a preliminary injunction.

### 2. Equal Protection

Given the Court's determination that Plaintiffs have met their burden to show entitlement to a preliminary injunction under the First Amendment, the Court need not reach the merits of the Equal Protection claim at this time.

**IT IS THEREFORE ORDERED** that

1. Defendant Balderas's Motion to Dismiss Complaint for Failure to State a Claim, Lack of Standing, and Immunity (**ECF No. 26**) is **DENIED**.

2. Defendant Oliver's Motion to Dismiss Claims against the Secretary of State in her Individual Capacity and Claims for Injunctive Relief (**ECF No. 36**) is **DENIED**.

3. The Court **STRIKES** reference to individual capacity claims in the caption.

4. Plaintiffs' Motion for Preliminary Injunction (**ECF No. 16**) is **GRANTED** as follows: Defendants are enjoined from enforcing the CRA's $5,500 per-election campaign contribution limit against the transfer of funds from the People for Pearce account to Representative Pearce's CRA account, Pearce for New Mexico, and from levying any restrictions on the subsequent use of those funds beyond those restrictions that apply equally to funds that were originally raised under state law.

5. Within **FOURTEEN DAYS** of the entry of this Memorandum Opinion and Order, the parties must file a joint submission that contains their stipulations or respective positions on following an expedited discovery and briefing schedule.

_____
**UNITED STATES DISTRICT JUDGE**